This is an action for actionable negligence, alleging damage, commenced by the plaintiff, Charles Pearson, against the defendant, Olivette Luther, for the recovery of damages to the person and property *Page 414 
of the plaintiff Pearson, because of the alleged negligent acts of the defendant Luther growing out of an automobile collision that occurred between the automobile driven by the plaintiff Pearson and that driven by the defendant Luther in the city of Asheville, at the intersection of Hilliard and Church streets. The defendant Luther filed answer denying plaintiff's allegations and set up a counterclaim for injuries which she alleged she sustained by reason of the alleged negligent acts of plaintiff Pearson at the time of the aforesaid automobile collision. In reply to the counterclaim of the defendant, the plaintiff pleaded the contributory negligence of the defendant in bar of her recovery against him. The case was heard before his Honor, Kitchin, J., presiding over the general county court, and a jury, and upon a verdict in favor of the defendant, as against the plaintiff, in the sum of $3,000, a judgment in said amount was entered and the plaintiff appealed to the Superior Court of Buncombe County for errors assigned. The case then duly came on for hearing on plaintiff's appeal before his Honor, H. Hoyle Sink, Judge of the Superior Court of Buncombe County, at the May Term, 1937. Judge Sink ruled on each one of plaintiff's exceptions and assignments of error, refusing to sustain said exceptions and assignments of error, and affirmed the judgment of the general county court. The plaintiff excepted to the signing of the judgment by Sink, J., and to each ruling of the court excepted and assigned errors, and appealed to the Supreme Court.
The collision, which is the subject of this controversy, took place about 6 o'clock p. m. on 21 May, 1936, at the intersection of Church and Hilliard streets in the city of Asheville, N.C. The plaintiff and defendant were both driving automobiles and both at the wheel. As one would approach Hilliard Street from Church Street, either north or south, there was hung a sign about 18 inches broad, some 12 feet high, at the intersection; the word "Stop" was printed on each side of the sign — on the north and south side of the sign. When one approached Church Street from Hilliard Street, from either side, on the sign was "Slow." The word "Stop" was written in white on Church Street on either side just before one entered Hilliard Street. Plaintiff was approaching Church Street and testified, in part, as follows: "As I approached the intersection of Hilliard and Church streets and observing the sign which hung up there I slowed down to about 12 or 15 miles an hour. Seeing the way was clear ahead of me, I proceeded on. As I got to the front side of Church Street there was a car coming rapidly to my right up Church Street, not stopping at the stop sign, and knowing it was going ahead of me I tried to dodge it but I couldn't. The car struck me on the post, the door post, the post that holds my door to my car that is on the back of the door, not on the front. It struck me on *Page 415 
the right side. It struck me there on the right rear fender and running board. When it struck me it turned my car around and over on the left side, with my car heading west. . . . When I observed this car which did collide with me it was coming over the `stop sign' this way. That car did not stop, as far as I could see. I think Miss Luther was operating that other car. That is, the defendant in this action; this lady her. . . . I observed it approaching me there; I know it seemed to be coming pretty fast toward me. (Cross-examination.) That is a blind corner and a slow sign is there. . . . When I approached that intersection I slowed down to 12 or 15 miles an hour. Seeing the the way clear, I proceeded on. . . . I run around her and I speeded up to try to get away from her. I can't tell you whether I went to my left of didn't. I went right straight ahead fast as I could. . . . I imagine it would take a car's length, may be two car's lengths, to stop that car."
Defendant Olivette Luther testified, in part, as follows: "The collision occurred at the intersection of Church and Hilliard streets. I was proceeding up Church Street, north. I was driving my car. . . . I had a collision with a car there. The car was going down Hilliard toward Biltmore Avenue, going east on Hilliard, coming from my left. I was coming from his right. Mr. Pearson was driving that car. . . . Q. Miss Luther, on approaching that intersection what did you do in reference to the operation of your car? Ans.: I hadn't been back in town very long. I had been out of town in Florida. I saw the `stop sign' and slowed up, went to low gear — I didn't absolutely stop the car, but I went into low gear. You know you have to go mighty slow to go into low gear. I couldn't see a thing. It was a blind corner. I put it into low gear, eased across the street in order to see up the street; eased across the sign up into Hilliard Street. I saw Mr. Pearson's car at the end of the block. I thought I had plenty of time to get across the street. I started across the street, was changing into second gear, something attracted my attention; I guess his brakes squeaking, he was coming so fast he was going to hit me; I pulled out Hilliard towards Biltmore, east, cut my car around; when I did that he was on me; we came together like this (indicating). Front end of my car hit the back end of his car. My car was knocked across the street over on the southern side of Hilliard Street. He was coming so fast his car turned over and turned around, reversed ends. As to how far out Hilliard Street from Church Street his car came to a Standstill, from the spot of oil that was on the street when his car turned over — you stepped it off — 30 feet. . . . At the time his car came in contract with my car I was turning out Hilliard in order to avoid the collision. Of course, he was pulling away from me the same as I was pulling away from him. He *Page 416 
pulled out towards the north side of Hilliard Street. From my observation of the operation of his car on that occasion, in my opinion he certainly was flying; he was going very fast — about sixty miles per hour, I imagine. I have an opinion as to how fast my car was moving at the time I entered the intersection and at the time he came in contact with my car with his machine. I wasn't going as fast as ten miles an hour because the needle of my speedometer was down below ten, between five and ten, around right, I should say. As to how far up Church Street you have to get before you could see out Hilliard, the middle of the car had to be out Hilliard, because this corner is in the way. A car has to be out fully — if the car is 15 feet long, it would have to be fully seven or eight feet out in the street before you could see. As to why I didn't stop instead of pulling on into the street, I think I stated that. I stated that when I said what I did. I almost stopped there. I couldn't see anything. It was a blind corner. I had to ease out into the street. Anybody has to ease out in the street. You can come up Church Street and can't see anything — you have to get out in there before you can see out in the street. He was inside the block. I had plenty of time to go across there had he been traveling at a normal rate of speed. . . . As to whether Mr. Pearson or I entered the intersection first, I was in the intersection when he was out on the street end — not end — but just inside the block down in front of Ravenscroft Drive. I was in the intersection of Church and Hilliard and he wasn't. When I speak of the intersection that is where the two streets cross here. It would be right there (witness marks on board). I was in that square prior to the time of the entry of Mr. Pearson, entry of his car. Mr. Pearson's car when I first saw it was just inside the block on Hilliard Street, I guess about 80 feet inside the block, down in front of Ravenscroft Drive about, I imagine, since the block is 280 feet it was probably 200 feet from me, around 200 feet from me. When I first saw him I could not judge his speed. I saw the car inside this block and I was in this intersection. I thought I had time to get across the street is the reason I started, proceeded to cross the street. He gave me no signal of his intention of coming on me. He made no signal at all. As to when I formed my opinion as to this speed he was a great deal closer to me. I must have heard his brakes squeaking — something made me realize he wasn't slowing up. Changing into second gear, I looked up — there he was right on me. He covered that distance in that period of time. As a consequence of that, I swerved my car sharply out to Hilliard Avenue. I turned to the ease in order to avoid his car that was rushing down on me. The cars came in contract. . . . I said it was the fault of Mr. Pearson because he was speeding, so I also said look at the skid marks on the street. (Cross-examination.) I was proceeding up Church *Page 417 
Street northwardly. The grade on this street is upgrade, very slight one on this end and more — it starts immediately at that intersection more steep. It begins to get steeper along about here. I was driving on the right-hand side of the street, right up this way. I saw the stop sign as I came up the street, the one on top. I saw the stop sign located here. As I approached them I saw those stop signs. I think the stop sign was a little farther back than it shows on this map, but I wouldn't say. I practically stopped momentarily. I went into low gear. You know how slow your car goes. I couldn't see anything. I had to go into low gear, moved on up in order to see. I think the stop sign was a little farther back this way. I came up to the stop sign and changed into low gear there. I couldn't see the street at that time. I couldn't see anything, that is why I went into low gear. I proceeded to cross on up this way. I changed gears back here and proceeded on. Q. Did you stop here? Ans,: No, sir. Mr. Brown: Now explain, if you wish. Ans.: I was in low gear; I didn't stop; I was looking out the street. I saw the car at the head of the hill. I had plenty of time to get across the street. Q. You didn't stop up here? Ans.: No, sir. Q. That is when you could first get view of this street? Ans.: Yes, sir. Q. You proceeded right on? Ans.: Yes, I proceeded right on and thought I had time to get across the street because the other car was at the end of the block. Q. You traveled right on from this point without stopping? Ans.: Yes, sir. I got as far as the middle of the street, or approximately the middle of the street, and the other car was coming at such a rate of speed I saw I couldn't get the rest of the way across so I swerved my car out Hilliard. I did not proceed straight from this point in low gear right straight across, I was changing gears about the time I realized Mr. Pearson's car was going to hit me, so I swerved then. . . . He veered his car but not far enough. He had so much speed he would have turned over if he had. He would have missed me, but turned over. He turned over the moment of the collision. He was about on one wheel when he hit me. He turned over, spinned around. My car didn't spin around as he did. . . . These pictures that have been placed in evidence were made by Mr. Sanford Brown, attorney, and I was along. The first time I saw Mr. Pearson's car after I got out in the street, his car was in the block, but it was at the farther end of the block." . . .
Eleven pictures were introduced by defendant, and the following occurred: "Defendant offers pictures to illustrate the witness' testimony. Plaintiff objected; objection overruled; plaintiff excepted. (The court.) The picture is admitted with the same restrictions as the others. The jury is instructed these photographs cannot be considered by you as substantive evidence, but may be used and considered only for the *Page 418 
purpose of illustrating such testimony as has been given or will be given by this witness. Q. Miss Luther, yesterday I handed you a number of pictures, which I now place black in your hand — please look those over. A. (Witness looks over pictures.) Q. State whether or not you were present at the taking of each and every one of those pictures? Plaintiff objected; objection overruled; plaintiff excepted. Yes, they were taken at two different times. Mrs. Brown was along one time. The other time you and I made them. The condition existing on 21 May, 1936, the date of this collision, had not changed as to any of these different views represented by these pictures, except the signboard had been moved. As to how far, the Outdoor man said yesterday it was ten feet. Q. These pictures, state whether they are true representation of those views? Plaintiff objected; objection overruled; plaintiff excepted. Ans.: Yes, sir. Plaintiff moved to strike out answer; denied; plaintiff excepted." A photographer was introduced by plaintiff, who took three pictures about the time of the trial, some time after the collision. "(Mr. Walton.) I would like to offer these pictures in evidence, these three pictures. Defendant objected; objection sustained; plaintiff excepted."
J. L. West, a former witness for plaintiff, was recalled by plaintiff and testified: "Q. Mr. West, I show you a photograph here and ask you whether or not the pictures shown on there is a true representation of the intersection as you saw it from this window at the time of the accident about which you have testified: Ans.: It is. Q. I believe you stated on direct examination you were sitting in the last window at the rear of that house? Ans.: Yes, sir. Q. What window were you sitting in? Ans.: The rear window. (Mr. Walton.) The plaintiff offers this picture in evidence. Defendant objected; objection sustained; plaintiff excepted. (The court.) The pictures cannot be used as evidence. (Mr. Walton.) I ask that they be introduced and identified. It is only for the purpose of interpreting and explaining this witness' testimony which he has already made and at this time makes on the witness stand. (The court.) This is sort of a reversal in the usual order of using a photograph. (Mr. Walton.) It is the same theory you let theirs in, your Honor, please. (The court.) The other witness had photographs which she took herself and testified about. (Mr. Walton.) She never did testify she took the photographs, she said Mr. Brown took them. (The court.) The pictures are not offered under the same circumstances as the pictures taken for the defendant. I will allow you to use these pictures where they are properly shown to be taken and properly identified by any witness testifying on the witness stand. He may use them to explain his testimony. That is the only purpose the could be permitted. (Mr. Walton.) Your Honor is permitting the other pictures *Page 419 
to be introduced under the same theory. (The court.) No, sir. You may think that, but I admitted them under entirely different circumstances. Q. Have you been about that scene of this intersection recently? Ans.: I was there yesterday morning. Q. State whether or not conditions there now are substantially similar to those existing there at the time this accident occurred, particularly with reference to the visibility of this intersection from where you were sitting? Defendant objected; objection sustained; plaintiff excepted." The defendant Olivette Luther, in rebuttal, stated that the conditions were not the same as at the time of the collision. Both parties introduced evidence corroborating their version of the collision. There was evidence that the cars were damaged and both plaintiff and defendant injured — defendant seriously so.
The plaintiff introduced an ordinance of the city of Asheville, N.C. as follows:
"Section 72, Vehicle Entering Through Highway or Stop Intersection. (2) The driver of a vehicle shall stop as required by this act at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from said through highway or which are approaching so closely on said through highway as to constitute an immediate hazard, but said driver having so yielded may proceed, and the drivers of all other vehicles approaching the intersection on said through highway shall yield the right of way to the vehicle so proceeding into or across the through highway. (b) The driver of a vehicle shall likewise stop in obedience to a stop sign as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway, and shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed."
The issue submitted to the jury and their answers thereto were as follows:
"1. Was the property of the plaintiff damaged by the negligence of the defendant as alleged in the complaint? Answer: `No.'
"2. Was the plaintiff personally injured and damaged by the negligence of the defendant as alleged in the complaint? Answer: `No.'
"3. Was the defendant damaged by the negligence of the plaintiff as alleged in the answer? Answer: `Yes.'
"4. Did the defendant by her negligence contribute to any injury which she received and as alleged in the reply of the plaintiff? Answer: `No.'
"5. What amount of damages, if any, is plaintiff entitled to recover of the defendant? Answer: ............. *Page 420 
"6. What amount of damages, if any, is defendant entitled to recover of the plaintiff? Answer: $3,000.'"
The material exceptions and assignments of error and other necessary facts will be considered in the opinion.
The questions involved: First. Did the trial court err in refusing to grant motion for judgment of nonsuit on counterclaim of defendant? We cannot so hold.
At the close of defendant's evidence and at the close of all the evidence the plaintiff, in the general county court of Buncombe County, made motions for judgment as in case of nonsuit as to defendant's counterclaim. C. S., 567. These motions were overruled and affirmed on appeal to the Superior Court. In this we see no error.
The evidence which makes for plaintiff's claim, or tends to support his cause of action, is to be taken in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonably inference to be drawn therefrom.
The evidence was to the effect that, although there was a stop signal, the view of Hilliard Street coming into it from Church Street going north was obstructed. It was a blind corner. Defendant slowed up and went into low gear, she eased out into the street. Had to get out into Hilliard Street before she could see out in the street, and if plaintiff had been traveling at a moderate rate of speed, in accordance with the law, she would have had plenty of time to get across the street. Before entering Hilliard Street she practically stopped momentarily, then proceeded, going less than 10 miles an hour. When she first saw plaintiff he was at the end of the block and she thought she had plenty of time to get across the street. "He was certainly flying, he was going very fast, about 60 miles per hour, I imagine." She was in the intersection and he was some 200 feet from it. He gave no signal, he was not slowing up; she got as far as the middle of the street and saw plaintiff's car was coming at such a rate of speed that she could not get across the street and would be hit, so swerved her car.
In Jones v. Bagwell, 207 N.C. 378, at p. 386, it is written: "It is well settled that contributory negligence is plaintiff's negligence act occurring and cooperating with defendant's negligent act in producing injury. Negligence and contributory negligence do not essentially differ.Liske v. Walton, 198 N.C. 741. The burden of proving negligence is on plaintiff, that of contributory negligence is on defendant. *Page 421 
In Elder v. R. R., 194 N.C. 617 (619), citing authorities, is the following: `Originally, under C. S., 567, in cases calling for its application, there was some question as to whether a plea of contributory negligence (the burden of such issue being on the defendant) could be taken advantage of on a motion to nonsuit, but it is now well settled that such may be done when the contributory negligence of the plaintiff is established by his or her own evidence, as he or she thus proves himself or herself out of court.'"
In Hendrix v. R. R., 198 N.C. 142 (144), it is written: "It is well settled in this jurisdiction that the violation of a town or city ordinance, or State statute, is negligence per se, but the violation must be the proximate cause of the injury. Ordinarily this is a question for the jury if there is any evidence, but if there is no evidence that the violation of the ordinance or statute is the proximate cause of the injury, this is for the court to determine."
If there is more than a scintilla of evidence, contributory negligence is for the jury. Moseley v. R. R., 197 N.C. 628. There must be a casual connection between the negligent act and the injury. The negligence must be the proximate cause or one of the proximate causes of the injury. N.C. Code, 1935 (Michie), sec. 2617 (a), requires under certain conditions that motor vehicles must come to a full stop at highway crossings. In the section is the following: "This section shall not interfere with the regulations prescribed by towns and cities. No failure so to stop shall be considered contributory negligence per se in any action for injury to person or property; but the facts relating to such failure to stop may be considered with other facts in determining negligence."
The city of Asheville passed an ordinance requiring persons to stop before entering Hilliard Street, but there are limitations in the ordinance: "And shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed." The testimony of defendant was that she was in the intersection and plaintiff was some 200 feet away.
Section 2618(D) is as follows: "Fifteen miles per hour in traversing an intersection of highways when the driver's view is obstructed. A driver's view shall be deemed to be obstructed when at any time during the last one hundred feet of his approach to such intersection he does not have a clear and uninterrupted view upon all of the highways entering such intersection for a distance of two hundred feet from such intersection."
The street intersection, to say the least, was a peculiar one. Plaintiff was coming east on a 7 per cent down grade on Hilliard Street into the intersection of Church and Hilliard streets. His view was obstructed. *Page 422 
The defendant was driving north on Church Street, 24 feet in width, and had to drive into Hilliard Street, upgrade, before she could see, on account of the concrete wall and evergreen hedge to her left — the direction from which plaintiff was coming. She was in the intersection when she saw plaintiff 200 feet away coming at 60 miles per hour. She had the right of way, and the evidence indicates that she was trapped by plaintiff's speed. Whether her failure to stop was the proximate cause of the injury was at least a question of fact for the jury to determine and not one of law for this Court.
Second. Did the trial court err in refusing to submit to the jury special instructions as requested and err in his charge to the jury in response to an inquiry from juror? We think not.
Under the view we take of the evidence, we think plaintiff's prayers for special instructions, as requested, were properly refused, but the court below gave same in substance. The court defined correctly negligence, contributory negligence, and proximate cause under the respective issues, and charged: "So when plaintiff has shown by the greater weight of the evidence that the defendant failed to exercise due care, and that in the failure to exercise due care she violated some legal duty to the plaintiff, and such failure on her part was the proximate cause of the collision and consequent injuries, then he will have established actionable negligence, so if you find by the greater weight of the evidence, it being the duty of the defendant to obey all the laws of the State and the city to stop at the intersection before entering, if you find she did not stop as required by law, and if you find her failure to stop at the intersection before entering it was the proximate cause of the collision, then you would, and it would be your duty to answer the first issue `Yes,' or if you find by the greater weight of the evidence that the defendant, Miss Luther, drove her car into the intersection at a rate of speed in excess of fifteen miles an hour, that would be negligence, and if you find that the speed of the car, if you find she did drive at that speed into the intersection was the proximate cause of the collision, then it would be your duty to answer the first issue `Yes.' The violation of any law or ordinance enacted or intended for the preservation or protection of the life, limb, or property is negligence in itself, and when it is shown by the greater weight of the evidence that such negligence was the proximate cause of the injuries complained of, then it would be actionable negligence, and you would answer the first issue `Yes.' The violation of any law or ordinance enacted or intended for the preservation or protection of the life, limb, or property is negligence in itself, and when it is shown by the greater weight of the evidence that such negligence was the proximate cause of the injuries complained of, then it would be actionable negligence, and you would answer the first issue *Page 423 
`Yes.' Not every negligent act is actionable negligence. Defendant may have been however negligent, if her negligence resulted in no injury as the proximate result of the injury, then it is not actionable negligence; only when negligence becomes the proximate cause of the injury does it establish liability on the part of the defendant. The court charges you it is a violation of the law to drive an automobile past the stop sign on Church Street at this intersection without bringing the car to a stop. The court charges you it would be a violation of the law to drive a car up Church Street into the intersection at a rate of speed in excess of fifteen miles an hour at this point." The charge covers clearly the law applicable to the facts.
Inquiry of the juror was as follows: "(Court.) Gentlemen, I take it you have not arrived at a verdict. First juror: We have all agreed that both parties were negligent. Second juror: Your Honor, the movement of the defendant's car into this hazardous place, it seems to have a tendency we don't get that cleared up exactly — in other words, what we have in mind is as to its stillness to a stop or whether coming in there it could gradually be moved and not necessitate a standstill. (Court.) Gentlemen, these parties are to be judged by the jury in the light of the circumstances in which they appeared to have been at the time. (Court.) The violation of a statute is not necessarily actionable negligence, but it is negligence, but not necessarily such negligence as would warrant a recovery against the party violating it unless the jury shall find by the greater weight of the evidence that the movement of the car of the defendant in entering the intersection was not in accordance with the standard of the prudent man, then it would be negligence, actionable negligence; in other words, the defendant is required to exercise that care which is commensurate with the circumstances in which she is placed; due care is that care which any person of ordinary prudence would have used in the same circumstances. If she failed to exercise due care in entering the intersection, regardless of whether she was violating the statute or not, if she failed to exercise due care, it would be negligence, because the duty she owed to the plaintiff was to exercise due care. Due care is a well defined meaning in the law, and that is always measured by the standard of what a person of ordinary prudence would have done under the same circumstances. If she failed to exercise that care, the next question that comes to the jury is, Was her failure the proximate cause, that is, the cause of the collision, the cause without which it would not have occurred? Suppose, for instance, that the jury should have found she stopped at the intersection, she stopped before entering, and then have done the same thing she says she did, if she was exercising due care when she drove into the intersection in the manner in which she contends she did. Every person is charged with *Page 424 
the duty in operating an automobile to exercise due care. Neither party is required, under the law, to anticipate the other party will violate the law. If the driver of an automobile sees another car approaching him in the middle of the street, he has the right to assume, before the car gets to him, the party driving the car in the middle of the street will go to his own side of the road, and he has the right to act upon that assumption, so if the plaintiff was coming down the street, he had the right to assume every person crossing that intersection would obey the law and not cross the intersection without ascertaining the condition of the traffic in it. On the other hand, the defendant had the right to assume, if she saw the plaintiff driving down the hill at a rapid rate of speed, she had the right to assume before he got to the crossing he would bring his car down to the speed required by law and bring himself within the law before he reached the intersection. She had a right to assume he would do that and to act upon that assumption, and she could act upon it without being held guilty of negligence. It is a question of what a person of ordinary prudence would have done under those circumstances. There is no degree of care to be used. The test is whether the care that was exercised was such care as a person of ordinary prudence should have used when confronted by the same situation, charged with a like duty. A person handling sticks of dynamite would be required to use that care which a person of ordinary prudence should use when handling dynamite. A person handling stovewood would be required to use that degree of care which a person of ordinary prudence should use when handling stovewood. It would naturally, of course, require more care in handling dynamite than in handling stovewood. But the test is: `What would a person of ordinary prudence have done under those circumstances, what would you or any other person of ordinary prudence have done when confronted and placed in the same situation?' Both parties are held to the degree of care which a person of ordinary prudence should have used under the circumstances in which they were placed; as I say, both parties may rely upon the other party or assume the other party will obey the law, and if one violates the law, then the question is whether that violation was the cause of the accident. Proximate cause is that cause without which it would not have happened, the actual cause that produced the collision, and that is the question you have to decide, of course, and you must decide it from the evidence as you heard it here, measure the conduct of the parties by the rule of the prudent man."
Taking the charge in connection with the charge previously given, that it was the duty of the defendant "to stop at the intersection before entering," etc., we see no prejudicial or reversible error. *Page 425 
Third. Did the trial court err in its ruling as to the introduction of certain evidence? This relates to the photographs exhibited by defendant. They were not introduced as substantive evidence.
In Elliott v. Power Co., 190 N.C. 62 (65), it is said: "Plaintiffs excepted because certain pictures were submitted to the jury. All of these pictures were used to explain the witnesses' testimony to the jury. It was not error for the court to allow the jury to consider the pictures for this purpose and to give them such weight, if any, as the jury may find they are entitled in explaining the testimony." Honeycutt v. Brick Co., 196 N.C. 556;Kelly v. Granite Co., 200 N.C. 326. We think they were competent and the restriction properly made "cannot be considered by you as substantive evidence, but may be used and considered only for the purpose of illustrating such testimony as has been given or will be given by this witness." After plaintiff had objected and excepted to these pictures, it seems about the time of the trial he had a photographer take three pictures. The plaintiff then recalled J. L. West, who had theretofore testified for plaintiff, and asked certain questions in regard to the photographs. The defendant objected, and the objection was sustained.
The defendant, Olivette Luther, in rebuttal testified that the conditions were not the same as at the time of the collision. Thus there was evidence, pro and con, as to the similarity of conditions. We think, under the facts and circumstances of this case, the matter was in the sound discretion of the trial court. N.C. Handbook of Evidence (Lockhart), sec. 277; Hampton v. R. R., 120 N.C. 534. The court below overruled all the exceptions and assignments of error made by plaintiff in the general county court and found no error in the judgment. On the whole record we see no prejudicial or reversible error.
The judgment of the court below is
Affirmed.